# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

April 11, 2017

Lyle W. Cayce
Clerk

No. 16-60245

H. KENNETH LEFOLDT, JR., in his capacity as Trustee for the Natchez
Regional Medical Center Liquidation Trust,

> Plaintiff–Appellee,

v.

HORNE, L.L.P.,

> Defendant–Appellant.

---

Appeal from the United States District Court
for the Southern District of Mississippi

---

Before KING, OWEN, and HAYNES, Circuit Judges.

OWEN, Circuit Judge:

Horne, L.L.P. (Horne) moved to compel arbitration and to stay proceedings in federal district court pending arbitration. Horne and the chief financial officer of Natchez Regional Medical Center (NRMC), a community hospital that is a Mississippi public entity, signed three documents (in 2009, 2010, and 2012) detailing terms upon which Horne would provide audit services for NRMC. A threshold issue in this interlocutory appeal is whether the "minutes rule," also known as the "minutes requirement," under Mississippi law pertains to "the issue of the contract's validity," or instead

more closely resembles "whether the alleged obligor [NRMC] ever signed the contract."[1]

We conclude that, with respect to the 2010 and 2012 engagement letters, the minutes rule pertains to whether written agreements between NRMC and Horne were formed in each of those years, and therefore, whether written contracts were consummated is a question for the courts rather than an arbitrator. We conclude that because of the minutes requirement, the 2010 and 2012 engagement letters are not contracts to which NRMC is a party, and therefore, NRMC is not a party to the arbitration provisions contained in the 2010 and 2012 engagement letters.

The minutes of NRMC's board reflect that an agreement with Horne was reached in 2009, and we therefore conclude that the minutes rule does not pertain to that contract's formation. NRMC's arguments based on the minutes rule instead relate to the validity or enforceability of the terms of that agreement generally and do not go "to the making of the agreement to arbitrate."[2] Parties may agree that the validity or enforceability of a contract's terms are to be resolved in arbitration. However, the scope of the arbitration agreement in the 2009 engagement letter was not raised as an issue in this appeal and has not been resolved in the district court. On remand, the district court should determine the scope of the arbitration agreement—specifically, whether the arbitration agreement in the 2009 engagement letter requires arbitration of the effect of the minutes rule on the validity of the 2009 engagement letter. If the parties did not agree to arbitrate that issue, then the district court should resolve the effect of the minutes rule on the validity of the 2009 letter agreement.

---

[1] *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 444 n.1 (2006).

[2] *Id*. at 445.

No. 16-60245

We further conclude that the Mississippi minutes rule is one of general applicability to Mississippi contracts with public entities and the requirement of § 2 of the Federal Arbitration Act (FAA) that "courts must place arbitration agreements on an equal footing with other contracts"[3] does not foreclose its application in this case.

The district court's denial of the motion to compel arbitration with regard to the 2010 and 2012 engagement letters was not error. However, we vacate the district court's denial of Horne's motion to compel arbitration with regard to the 2009 letter agreement and remand to the district court for further proceedings.

## I

We briefly review the underlying facts and the procedural posture of the proceedings in the district court. NRMC's Chief Financial Officer, Charles Mock (Mock), purportedly on behalf of NRMC, signed three engagement letters that are pertinent to this appeal detailing the terms upon which Horne would provide auditing services to NRMC. Each engagement letter contained arbitration provisions.

The first agreement relevant to this appeal was presented by Horne to Mock in August 2009. On August 12, 2009, the minutes of NRMC's board reflect:

> **Management Report:** Charles Mock reported that he had received a proposal for the annual audit for a one year contract from the Horne CPA Group of Jackson, Mississippi. Mr. Bland asked if other bids were taken and Mock reported that only one bid had been received and that from Horne. No action was taken at this time. Mr. Bland asked Mr. Mock to approach Horne again to request they consider not increasing their bid from the prior year.

---

[3] *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (citing 9 U.S.C. § 2).

No. 16-60245

Subsequent board minutes, dated September 2, 2009, reflect:

> **OTHER BUSINESS**:  C. Mock presented the bids for auditor with Horne CPA group costing 48,000.00 and BKD CPA costing 58,000.00 plus expense charges including travel, report processing, etc.
>
> **R. Grennell made the motion to accept the Horne CPA Group audit bid with B. Pyron seconding the motion.  The motion passed unanimously by the Board to accept the Horne CPA Group audit bid at $48,000.00.**

Mock, as Chief Financial Officer of NRMC, executed the 2009 engagement letter with Horne following the September 2, 2009, session.  Subsequently, in April 2010, minutes of the board of trustees reflect that the board reviewed NRMC's financial statements for 2009 with Horne.

Mock signed two other engagement letters, in 2010 and 2012, purporting to act on behalf of NRMC in retaining Horne to perform auditing services, but there is no mention of either of the agreements in the minutes of NRMC's board of trustees.  Nevertheless, NRMC admits that Horne performed annual audit services and that NRMC paid the amount specified in the engagement letters, $48,000 each year.

NRMC filed a voluntary petition for relief pursuant to Chapter 9 of the bankruptcy code in 2014.  The court-appointed trustee for NRMC's Chapter 9 bankruptcy estate is H. Kenneth Lefoldt, Jr.  The Chapter 9 plan confirmed by the bankruptcy court gave Lefoldt the right to pursue all claims, demands, and causes of action belonging to NRMC.  Lefoldt, as Trustee, has sued Horne, contending that Horne committed professional malpractice in auditing NRMC.  Because the Trustee stands in the stead of NRMC, and to minimize confusion, we will refer only to "NRMC."

Horne filed a motion in federal district court seeking to compel arbitration and requesting a stay pending arbitration.  The district court denied that motion, concluding that because none of the arbitration

4

No. 16-60245

agreements were set forth or described in the board's minutes, "no such agreement [to arbitrate] exists."   The district court additionally rejected Horne's contention that NRMC should be equitably estopped from denying the existence and enforceability of the engagement letters and the arbitration provisions contained in them.  Horne has appealed.

## II

The 2009 engagement letter contained an arbitration provision, set forth in the margin,[4] that is more limited than those in the 2010 and 2012 agreements.   The 2010 and 2012 engagement letters each have a lengthy "Claims Resolution" section that includes an arbitration clause that provides:

> Any dispute arising out of or relating to this engagement will be resolved by binding arbitration conducted before a panel of three arbitrators in accordance with the United States Arbitration Act and, to the extent not inconsistent with such law, the Professional Accounting and Related Services Dispute Resolution Rules of the American Arbitration Association. . . .   The arbitrator . . . shall determine any controversy concerning whether a claim is arbitrable.

The Supreme Court has "recognized that parties can agree to arbitrate 'gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy."[5]  The

---

[4] The 2009 engagement letter provided:

The Hospital and HORNE both agree that any dispute over fees charged by the accountant to the client will be submitted for resolution by arbitration in accordance with the Rules for Professional Accounting and Related Services Disputes of the American Arbitration Association.  Such arbitration shall be binding and final.  In agreeing to arbitration, we both acknowledge that, in the event of a dispute over fees charged by HORNE, each of us is giving up the right to have the dispute decided in a court of law before a judge or jury and instead we are accepting the use of arbitration for resolution.

[5] *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 68-69 (2010).

No. 16-60245

Court has explained that "[a]n agreement to arbitrate a gateway issue is simply an additional, antecedent agreement the party seeking arbitration asks the federal court to enforce, and the FAA operates on this additional arbitration agreement just as it does on any other."[6] Such an agreement "is valid under § 2 'save upon such grounds as exist at law or in equity for the revocation of any contract,' and federal courts can enforce the agreement by staying federal litigation under § 3 and compelling arbitration under § 4."[7]

This appeal presents several questions. Among them are whether the Mississippi minutes rule (1) invalidates the engagement letters, and consequently the arbitration provisions, or (2) invalidates the arbitrations provisions, regardless of whether other provisions in the engagement letters are enforceable, or (3) requires the conclusion that no contract at all was formed between Horne and NRMC. We first consider whether the minutes requirement raises a question as to "whether any agreement between the parties 'was ever concluded.'"[8]

The Supreme Court has drawn a distinction between "validity" of an agreement and "whether any agreement between the parties 'was ever concluded.'"[9] The Court made clear in *Buckeye Check Cashing* and *Rent-A-Center* that when it explained that "[t]here are two types of validity challenges under § 2,"[10] it was not addressing a contention that no agreement was ever concluded by the parties.[11] The Court said in *Buckeye Check Cashing* that:

---

[6] *Id.* at 70.

[7] *Id.* (quoting 9 U.S.C. § 2).

[8] *Id.* at 70 n.2 (quoting *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 444 n.1 (2006)).

[9] *Id.* ("The issue of the agreement's 'validity' is different from the issue whether any agreement between the parties 'was ever concluded.'") (quoting *Buckeye Check Cashing*, 546 U.S. at 444 n.1).

[10] *Id.*

[11] *See id.*; *Buckeye Check Cashing*, 546 U.S. at 444 n.1.

No. 16-60245

The issue of the contract's validity is different from the issue whether any agreement between the alleged obligor and obligee was ever concluded. Our opinion today addresses only the former, and does not speak to the issue decided in the cases cited by respondents (and by the Florida Supreme Court), which hold that it is for courts to decide whether the alleged obligor ever signed the contract, *Chastain v. Robinson–Humphrey Co.*, 957 F.2d 851 (C.A.11 1992), whether the signor lacked authority to commit the alleged principal, *Sandvik AB v. Advent Int'l Corp.*, 220 F.3d 99 (C.A.3 2000); *Sphere Drake Ins. Ltd. v. All American Ins. Co.*, 256 F.3d 587 (C.A.7 2001), and whether the signor lacked the mental capacity to assent, *Spahr v. Secco*, 330 F.3d 1266 (C.A.10 2003).[12]

The Supreme Court has instructed that "[w]hen deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally . . . should apply ordinary state-law principles that govern the formation of contracts."[13] In the present case, a Mississippi statute requires the board of trustees of a community hospital to "keep minutes of its official business,"[14] and the Mississippi courts have construed this and similar statutes to give rise to the minutes rule at issue in this case. We therefore consider how the state-law minutes rule has been interpreted and applied by the Mississippi courts in deciding whether it pertains to the validity or enforceability of an agreement or instead stands as a bar to the formation of a contract with a state entity such as NRMC.

In a 2015 decision, *Wellness, Inc. v. Pearl River County Hospital*, the Mississippi Supreme Court reviewed the purposes of the minutes requirement.[15] The court concluded that the requirement "has two major functions" that had been synthesized in a 1937 decision:

---

[12] *Buckeye Check Cashing*, 546 U.S. at 444 n.1.

[13] *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995).

[14] MISS. CODE. ANN. § 41-13-35(3) (West).

[15] 178 So. 3d 1287, 1292-93 (Miss. 2015).

> (1) That when authority is conferred upon a board, the public is entitled to the judgment of the board after an examination of a proposal and a discussion of it among the members to the end that the result reached will represent the wisdom of the majority rather than the opinion or preference of some individual member; and (2) that the decision or order when made shall not be subject to the uncertainties of the recollection of individual witnesses of what transpired, but that the action taken will be evidenced by a written memorial entered upon the minutes at the time, and to which the public may have access to see what was actually done.[16]

This reflects that the minutes rule is partially in the nature of a statute of frauds or a prohibition of reliance on parol evidence[17] to establish the terms of a contract with a public entity.  Generally, requirements that contracts be in writing or comply with certain formalities relate to enforceability, not to whether the parties had a meeting of the minds.[18]  But a requirement that a majority of a quorum of the board assent to a contract, in an open meeting,[19]

---

[16] *Id.* at 1293 (quoting *Lee County v. James*, 174 So. 76, 77 (Miss. 1937)).

[17] *See Myers v. Blair*, 611 So. 2d 969 (Miss. 1992) (stating that the "minutes are the exclusive evidence of what the board did; and that parol evidence is not admissible to show what action the board took") (quoting *Noxubee County v. Long*, 106 So. 83, 86 (Miss. 1925)).

[18] *See generally* 10 WILLISTON ON CONTRACTS § 27:1 (4th ed.) ("The great weight of authority in this country holds that an oral contract that does not comply with the requirements of the Statute of Frauds is 'unenforceable' rather than void."); *id.* § 27:3 ("Under most states' Statutes of Frauds, it is generally held that the enforceability of a bargain, rather than its validity, depends on satisfaction of the Statute."); RESTATEMENT (SECOND) OF CONTRACTS § 138 cmt. b (AM. LAW. INST. 1981) ("Despite variations in wording, the American statutes based on the English Statute of Frauds are read to make contracts unenforceable by action or defense unless the Statute is satisfied by a signed memorandum.").

[19] *See Smith County v. Mangum*, 89 So. 913, 914 (Miss. 1921) ("The board of supervisors may 'by a new contract, or an amendment of its original contract, or by a ratification (all of which must be by acts of the board in open session, spread upon its minutes), bind the county to pay.'") (quoting *Groton Bridge & Mfg. Co. v. Bd. of Sup'rs of Warren Cty.*, 31 So. 711, 712 (1902)); *see also Lee County*, 174 So. at 77 ("When official authority is conferred upon a board or commission consisting of three or more members, the authority so conferred must be exercised by a legal quorum, and, as a general rule, the decisions to be executed or the contracts to be awarded by the board must be determined or decided upon only in or at a lawfully convened session, and the proceedings must be entered upon the minutes, of the board or commission.").

seems more in the nature of a contract formation requirement. In *Wellness, Inc.*, the Mississippi Supreme Court explained in this regard that "the reasoning behind requiring contracts to be spread upon the minutes is that the minutes rule 'protect[s] the board from being bound by the unauthorized acts of individual members of the board or an agent thereof'" and that "by enforcing the minutes rule, the Court has recognized the importance of recorded, express consent by all board members to board actions, as board members are elected officials charged with the protection of the public's funds."[20]

Nevertheless, whether the minutes requirement precludes enforcement of an agreement or instead forecloses formation of an agreement, given the facts in the present case, is a close question. Horne contends, with some purchase, that "the rule accepts that a contract exists between the parties, but simply refuses to enforce the contract on public policy grounds."

This is true with regard to some fact patterns, as the Mississippi Supreme Court's decision in *Wellness, Inc.* recognized. The court recited the rule that "[n]o contract can be implied or presumed, it must be stated in express terms and recorded on the official minutes and the action of the board."[21] "However," the court explained, "the entire *contract* need not be placed on the minutes. Instead, it may be enforced where 'enough of the terms and

---

[20] *Wellness, Inc.*, 178 So. 3d at 1292 (quoting *Cmty. Extended Care Ctrs., Inc. v. Bd. of Supervisors for Humphreys Cty.*, 756 So. 2d 798, 800 (Miss. Ct. App. 1999)). The court explained, "However, *Butler* goes further, revealing the broader purpose of the minutes requirement. The *Butler* Court went on to state that if the board were not required to make the entries onto its minutes,

> an individual member of the board or agent thereof would be capable of binding the board and expending the public taxpayer's money without the benefit of the consent of the board as a whole which was elected and responsible for such purposes. In sum, the policy of protecting the public's funds for use and for the public is paramount to other individual rights which may also be involved."

*Id.* (quoting *Butler v. Bd. of Supervisors for Hinds Cty.*, 659 So. 2d 578, 579 (Miss. 1995)).

[21] *Id.* at 1291 (quoting *Burt v. Calhoun*, 231 So. 2d 496, 499 (Miss. 1970)).

conditions of *the contract* are contained in the minutes for determination of the liabilities and obligations of *the contracting parties* without the necessity of resorting to other evidence."[22]   This unmistakably means that in some instances, the minutes rule is not a matter of contract formation but instead is a rule preventing consideration of evidence of the terms of the contract other than what is set forth in the minutes.  When applied in this manner, the minutes rule seems to be one regarding validity or, more precisely, enforceability of contract terms not described in the minutes.  The existence of a contract is not at issue in such a case; a meeting of the minds between the board and another party has occurred; but only the terms of the "contract" that are "contained in the minutes" are enforceable.

Another Mississippi decision, *Thompson v. Jones County Community Hospital*, reflects that a board consummated a contract to employ Thompson as the executive director of a county hospital.[23]   The court affirmed the dismissal of Thompson's claim for salary owed because the amount of his compensation was not set forth in the minutes, even though the minutes reflected the award of a four-year contract, gave a member of the board the authority to draft the contract's terms, and stated that the contract was reviewed and approved.[24]   The court refused to resort to outside evidence to determine the salary, hewing to the rule that "it [is] the responsibility of the [private contracting party] to see that the contract was properly recorded on the minutes."[25]  Obviously, the board had agreed to compensate Thompson, but the minutes requirement limited a court's ability to ascertain and enforce the amount he was to have been paid.

---

[22] *Id*. (emphasis added).

[23] 352 So. 2d 795, 797-98 (Miss. 1977).

[24] *Id*.

[25] *Id*. at 798.

No. 16-60245

Based on these decisions, we cannot say that, categorically, the Mississippi minutes requirement pertains to contract formation rather than the validity or enforceability of a contract or certain of its provisions. In some circumstances, the minutes requirement bars proof of some of the terms of a contract that was in fact concluded with a board and the existence of which is reflected Board minutes. In such situations, the minutes rule is more properly characterized as relating to the validity of contract terms. In other circumstances, the minutes requirement is more properly characterized as pertaining to contract formation because it results in no formation of a contract at all,[26] or the rule operates to prevent a board from being bound by the actions of single board member or an agent who acted without authority.[27]

With regard to the 2010 and 2012 engagement letters, the question of "whether any agreement between the parties 'was ever concluded'"[28] is presented because neither of these agreements is referenced, at all, in the minutes of NRMC's board. The minutes rule under Mississippi law requires that the board of a public entity cannot act to enter into a contract unless that action is taken by a majority of a quorum of the board at a meeting and is

---

[26] *See generally Urban Developers LLC v. City of Jackson*, 468 F.3d 281, 299 (5th Cir. 2006) (observing Mississippi's "past strict adherence to the requirement that a board of supervisors only be bound by a contract entered upon its minutes" and acknowledging that "[t]his requirement applies not only to contract formation, but to contract modification as well") (quoting *Butler v. Bd. of Supervisors for Hinds Cty.*, 659 So. 2d 578, 581 (Miss. 1995)).

[27] *See, e.g., Rawls Springs Util. Dist. v. Novak*, 765 So. 2d 1288, 1292 (Miss. 2000) (holding that the utility district board's president could not bind the board absent authorization or other action by the board on the minutes); *Colle Towing Co. v. Harrison County*, 57 So. 2d 171, 172 (Miss. 1952) (holding that the oral contract between the board president and a private party was "void and that no valid contract was ever made" with the county).

[28] *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 70 n.2 (2010) ("The issue of the agreement's 'validity' is different from the issue whether any agreement between the parties 'was ever concluded.'") (quoting *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 444 n.1 (2006)).

11

reflected in the board's minutes.[29]  Therefore, whether that rule of contract formation applies and whether contracts were formed between NRMC and Horne in 2010 and 2012 is a matter to be resolved by the courts, not an arbitrator or arbitration panel.  In ruling upon Horne's motion to compel arbitration, the district court expressly declined to resolve at that point in the litigation whether the 2010 or 2012 engagement letters constituted contracts between NRMC and Horne.  The district court instead concluded that no *arbitration* agreements existed.  For reasons we will explain in considering whether NRMC challenged the validity of the arbitration provision in the 2009 engagement letter (as distinguished from challenging the validity of the entire agreement), the district court should not have reached the question of whether an arbitration agreement existed without first determining whether *any* contract existed.  However, there are no factual disputes, and whether the 2010 and 2012 engagement letters constitute contracts with NRMC is a question of law.  We conclude that because of the minutes requirement, NRMC is not a party to the 2010 and 2012 engagement letters.  No agreement to arbitrate, other than the arbitration provisions of those letter agreements, has been alleged.  Accordingly, no error occurred when the district court denied Horne's motion to compel arbitration as to the 2010 and 2012 engagement letters.

Unlike the 2010 and 2012 engagement letters, the minutes of NRMC's board unequivocally reflect that a contract between Horne and NRMC was concluded in 2009, and NRMC does not contend otherwise.  NRMC argues instead that the minutes rule either forecloses the possibility that there was an agreement to arbitrate or precludes enforcement of the arbitration provision.  Based on how the Mississippi courts have applied the minutes rule

---

[29] *See supra* n.28.

when the existence of a contract is reflected in the minutes, we conclude that, in such circumstances, the state-law requirement relates not to the formation of a contract, as that concept has been expressed in Supreme Court decisions including *Rent-A-Center* and *Buckeye Check Cashing*, but to what specific terms of the contract can be proven and enforced. NRMC's challenge involves "validity," not contract formation, with regard to the 2009 engagement letter. We must therefore ascertain whether NRMC's contentions regarding the applicability of the minutes rules is, in actuality, a challenge to the validity of the arbitration provision, as distinguished from a challenge to the engagement agreement as a whole or other parts of the engagement letter.

The Supreme Court has explained that "[t]here are two types of validity challenges under § 2."[30]  "One type challenges specifically the validity of the agreement to arbitrate."[31]  "The other challenges the contract as a whole, either on a ground that directly affects the entire agreement (*e.g.*, the agreement was fraudulently induced), or on the ground that the illegality of one of the contract's provisions renders the whole contract invalid."[32]  The Supreme Court has held that even if "another provision of the contract, or . . . the contract as a whole," is invalid, unenforceable, voidable, or void, that "does not prevent a court from enforcing a specific agreement to arbitrate" because, "[a]s a matter of substantive federal arbitration law, an arbitration provision is severable from the remainder of the contract."[33]

The Court has given examples.  "[I]n an employment contract many elements of alleged unconscionability applicable to the entire contract (outrageously low wages, for example) would not affect the agreement to

---

[30] *Rent-A-Center*, 561 U.S. at 70.

[31] *Buckeye Check Cashing*, 546 U.S. at 444; *see also Rent-A-Center*, 561 U.S. at 70.

[32] *Buckeye Check Cashing*, 546 U.S. at 444; *see also Rent-A-Center*, 561 U.S. at 70.

[33] *Rent-A-Center*, 561 U.S. at 70-71 (quoting *Buckeye Check Cashing*, 546 U.S. at 445).

arbitrate alone."[34] "But even where that is not the case—as in *Prima Paint* itself, where the alleged fraud that induced the whole contract equally induced the agreement to arbitrate which was part of that contract—we nonetheless require the basis of challenge to be directed specifically to the agreement to arbitrate before the court will intervene."[35] The Court similarly explained in *Buckeye Check Checking* that "if the claim is fraud in the inducement of the arbitration clause itself—an issue which goes to the making of the agreement to arbitrate—the federal court may proceed to adjudicate it. But the statutory language does not permit the federal court to consider claims of fraud in the inducement of the contract generally."[36] That is a matter for the arbitrator.[37]

In *Buckeye Check Cashing*, the Supreme Court rejected the argument that "since an agreement void *ab initio* under state law is not a 'contract,' there is no 'written provision' in or 'controversy arising out of' a 'contract,' to which § 2 can apply."[38] The Court explained that "contract," as used in § 2, "which allows a challenge to an arbitration provision 'upon such grounds as exist at law or in equity for revocation of any *contract*,'" "must include contracts that later prove to be void."[39] The Court recognized "that the *Prima Paint* rule permits a court to enforce an arbitration agreement in a contract that the arbitrator later finds to be void. But it is equally true that respondents' approach permits a court to deny effect to an arbitration provision in a contract that the court later finds to be perfectly enforceable."[40] The Court explained

---

[34] *Id*. at 71.

[35] *Id*. (referring to *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395 (1967)).

[36] *Buckeye Check Cashing*, 546 U.S. at 445 (quoting *Prima Paint*, 388 U.S. at 403-04).

[37] *Id*. at 445-46 ("[U]nless the challenge is to the arbitration clause itself, the issue of the contract's validity is considered by the arbitrator in the first instance.").

[38] *Id*. at 447.

[39] *Id*. at 448 (emphasis in original) (quoting 9 U.S.C. § 2).

[40] *Id*. at 448-49.

that "*Prima Paint* resolved this conundrum—and resolved it in favor of the separate enforceability of arbitration provisions."[41]  The Court reiterated, "a challenge to the validity of the contract as a whole, and not specifically to the arbitration clause, must go to the arbitrator."[42]

The Court made clear that even if the contract in which an arbitration clause is included is void rather than voidable, that "distinction" is "irrelevant."[43]  The arbitration agreement is severable, as a matter of federal law.[44]  It is only when the challenge is to the arbitration clause itself that the court, rather than an arbitrator, decides whether the arbitration agreement, as distinct from the contract in which it appears, is valid, irrevocable, or enforceable[45] "save upon such grounds as exist at law or in equity for the revocation of any contract."[46]  The Court observed that in prior decisions, it had "rejected the proposition that the enforceability of the arbitration agreement turned on the state legislature's judgment concerning the forum for enforcement of the state-law cause of action."[47]  In *Buckeye Check Cashing*, the Court said "we cannot accept the Florida Supreme Court's conclusion that enforceability of the arbitration agreement should turn on 'Florida public policy and contract law.'"[48]

---

[41] *Id.* at 449.

[42] *Id.*

[43] *Id.* at 446.

[44] *Id.* at 445 ("First, as a matter of substantive federal arbitration law, an arbitration provision is severable from the remainder of the contract."); *Rent-A-Center*, 561 U.S. at 70-71 ("[A] party's challenge to another provision of the contract, or to the contract as a whole, does not prevent a court from enforcing a specific agreement to arbitrate.").

[45] *Buckeye Check Cashing*, 546 U.S. at 445-46 ("Second, unless the challenge is to the arbitration clause itself, the issue of the contract's validity is considered by the arbitrator in the first instance.").

[46] 9 U.S.C. § 2.

[47] *Buckeye Check Cashing*, 546 U.S. at 446.

[48] *Id.* (quoting *Cardegna v. Buckeye Check Cashing, Inc.*, 894 So. 2d 860, 864 (Fla. 2005)).

The Fifth Circuit has applied the Supreme Court's teaching.    In *Primerica Life Insurance Co. v. Brown*, a party contended that, because he lacked mental capacity to execute a contract that contained an arbitration clause, the contract he signed was void and the court could not order arbitration.[49]   This court disagreed, holding that the "capacity defense is a defense to his entire agreement with CitiFinancial and not a specific challenge to the arbitration clause."[50]   The question of capacity and its effects on the contract was a matter for the arbitrator to decide.[51]   The *Primerica* opinion cited other decisions in which this court has held that a contention that a contract is void or unenforceable does not challenge directly the arbitration provision, and therefore, such challenges must be decided by the arbitrator rather than the court.[52]

The *Buckeye Check Cashing* principles were further elucidated in *Rent-A-Center, West, Inc. v. Jackson*.[53]   The agreement under scrutiny consisted only

---

[49] 304 F.3d 469, 471-72 (5th Cir. 2002).

[50] *Id*. at 472.

[51] *Id*.

[52] *See id*.:

> This court has applied the *Prima Paint* rule on numerous occasions. *See Snap-On Tools Corp.* [*v. Mason*, 18 F.3d 1261, 1267-68 (5th Cir. 1994)] (submitting fraudulent inducement defense to arbitration because allegations of fraud did not specifically relate to the arbitration clause); *R.M. Perez & Assoc., Inc.* [*v. Welch*, 960 F.2d 534, 538-39 (5th Cir. 1992)] (submitting allegations of fraud in obtaining signatures to contract to arbitration because defense was not specific to the arbitration agreement); *Lawrence v. Comprehensive Business Serv. Co.*, 833 F.2d 1159, 1162 (5th Cir. 1987) (submitting illegality defense to arbitration because it did not specifically relate to arbitration clause); *Mesa Operating Ltd. Partnership v. Louisiana Intrastate Gas Corp.*, 797 F.2d 238, 244 (5th Cir. 1986) (submitting claim that contract was void *ab initio* to arbitration because parties failed to demonstrate that the arbitration agreement was "invalid separately from the entire contract").

[53] 561 U.S. 63 (2010).

16

of an agreement to arbitrate employment disputes,[54] and the specific provision within that agreement that Rent-A-Center sought to enforce was a "delegation provision . . . that gave the arbitrator 'exclusive authority to resolve any dispute relating to the . . . enforceability'" of the agreement.[55] Jackson, the employee, argued that the agreement as whole (as noted, an arbitration agreement) was unconscionable.[56] But none of the arguments as to why the agreement was unconscionable pertained specifically to the delegation clause.[57] The Court held that "unless Jackson challenged the delegation provision specifically, we must treat it as valid under § 2, and must enforce it under §§ 3 and 4, leaving any challenge to the validity of the Agreement as a whole for the arbitrator."[58]

NRMC asserts that the arbitration provision in the 2009 engagement letter is invalid, unenforceable, revocable, voidable, or void because of the minutes requirement. But NRMC does not explain how the minutes rule operates on the arbitration provision any differently than it operates on other provisions of the 2009 engagement letter that are not reflected in the board's minutes. As discussed above, the Supreme Court has rejected arguments that grounds for refusing to enforce a contract in its entirety, such as fraud in the inducement, ineluctably means that the arbitration agreement was also induced by fraud.[59] An argument that fraud induced a contract is not the equivalent of a contention that there was "fraud in the inducement of the

---

[54] *Id.* at 72 ("In this case, the underlying contract is itself an arbitration agreement. But that makes no difference.").

[55] *Id.* at 71.

[56] *Id.* at 73.

[57] *Id.* at 72-75.

[58] *Id.* at 72.

[59] *See, e.g., id.* at 71.

17

arbitration clause itself."[60]  The Supreme Court explained in *Buckeye Check Cashing* that "if the claim is fraud in the inducement of the arbitration clause itself—an issue which goes to the making of the agreement to arbitrate—the federal court may proceed to adjudicate it.  But the statutory language does not permit the federal court to consider claims of fraud in the inducement of the contract *generally*."[61]  The minutes requirement is *generally* applicable to the 2009 engagement letter.  Accordingly, a claim that the minutes rule necessarily applies to the arbitration provision is not a claim that the minutes rule applies specifically to the agreement to arbitrate in a way that differs from its general effect.  As explained in *Rent-A-Center*: "where the alleged fraud that induced the whole contract equally induced the agreement to arbitrate which was part of that contract—we nonetheless require the basis of challenge to be directed specifically to the agreement to arbitrate before the court will intervene."[62]

Accordingly, to the extent that NRMC relies on the minutes rule to challenge the "validity" of the 2009 agreement to *arbitrate*, that challenge fails because it is not, in actuality, a challenge directed specifically to the agreement to arbitrate.  Whether and how the minutes rule applies to the 2009 engagement letter and the scope of the arbitration clause would be a matter for an arbitrator or arbitration panel unless there is "evidence that the contracting parties intended to withhold that issue [or issues] from

---

[60] *Id.* (quoting *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 403 (1967)).

[61] *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 445 (2006) (emphasis added) (quoting *Prima Paint Corp.*, 388 U.S. at 403-04).

[62] *Rent-A-Center*, 561 U.S. at 71.

arbitration."[63]   What the parties intended to arbitrate, as expressed in the arbitration provisions, is not part of this appeal and is a matter to be resolved in further proceedings.  On remand, the district court should resolve the scope of the arbitration agreement, including whether the arbitration agreement delegates to an arbitrator the question of the effect of the minutes requirement on the validity of the arbitration agreement in the 2009 engagement letter.

### III

Horne contends that the FAA's requirement that courts place arbitration contracts on "equal footing" with all other contracts[64] forecloses the application of Mississippi's minutes requirement to the engagement letters.  Horne argues that (1) Mississippi's state policy interests advanced by the minutes rule, which Horne contends are "assuring that contracts with public bodies are approved by a majority of the governing board and making those contracts available for public scrutiny," elevates these policies above the parties' contractual rights, "mak[ing] the policy of protecting public funds 'paramount' to an individual's contract rights"; (2)  the district court applied the minutes rule to deem the arbitration clause in the engagement letters unenforceable but permits NRMC to enforce other provisions of those letters; and (3) the portions of the contract that the board selects for inclusion in its minutes are enforceable by a court, but selective use by the board to avoid certain clauses in contracts is not in accord with a federal principle that favors arbitration.

The Supreme Court has held that arbitration agreements cannot be "invalidated . . . by defenses that apply only to arbitration or that derive their

---

[63] *Prima Paint*, 388 U.S. at 396; *see also First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, (1995) ("[A] court must defer to an arbitrator's arbitrability decision when the parties submitted that matter to arbitration.").

[64] *See DIRECTV, Inc. v. Imburgia*, 136 S. Ct. 463, 468 (2015) (quoting *Buckeye Check Cashing*, 546 U.S. at 443).

meaning from the fact that an agreement to arbitrate is at issue."[65]   This conclusion flows from § 2, which "permits arbitration agreements to be declared unenforceable 'upon such grounds as exist at law or in equity for the revocation of any contract.'"[66]   The Supreme Court has reasoned that "[t]his saving clause permits agreements to arbitrate to be invalidated by 'generally applicable contract defenses, such as fraud, duress, or unconscionability."[67] State laws, including state-court decisions, that do not "place[] arbitration contracts 'on equal footing with all other contracts'" cannot be used to invalidate or prevent the enforcement of an arbitration provision.[68]

In *DIRECTV, Inc.*, the Supreme Court determined whether state courts had failed to give equal footing to arbitration contracts by examining whether those courts would "interpret contracts other than arbitration contracts the same way."[69]   The Court also examined whether the state court "would [have] reach[ed] the same interpretation of [the commonly-used phrase] 'law of your state' in any context other than arbitration."[70]

The minutes requirement is generally applicable in Mississippi to contracts with a public entity.  An examination of Mississippi law reveals that Mississippi has applied the minutes requirement to a wide variety of contract provisions; its applicability is not limited to arbitration provisions.

A 1921 decision of the Supreme Court of Mississippi in *Smith County v. Mangum*[71] reviewed a number of prior decisions dealing with the minutes requirement. Mangum was the successful bidder for a county project to

---

[65] *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011).

[66] *Id*. (quoting 9 U.S.C. § 2).

[67] *Id*. (quoting *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687 (1996)).

[68] *DIRECTV, Inc.*, 136 S. Ct. at 468 (quoting *Buckeye Check Cashing*, 546 U.S. at 443).

[69] *Id*. at 469.

[70] *Id*.

[71] 89 So. 913 (Miss. 1921).

construct a bridge; he completed the bridge; members of the county board of supervisors accepted the bridge, certifying that it was in conformance with the county's plans and specifications; and the county used the bridge.[72]    The Mississippi court nevertheless held that, because the acceptance of the bid was not "spread upon the minutes of the board of supervisors," Mangum could not recover any payment for his work either under an express contract theory or on a quantum meruit basis under a theory of implied contract.[73]    The court quoted from numerous prior decisions applying the minutes requirement, explaining:

> The board of supervisors may "by a new contract, or an amendment of its original contract, or by a ratification (all of which must be by acts of the board in open session, spread upon its minutes), bind the county to pay in each of the cases named. And parties contracting with the counties are charged with knowledge of this statute."[74]

The court held in *Mangum* that:

> Under these authorities it is manifest that the board of supervisors of a county can only enter into an express contract by an order spread upon its minutes, and that there can be no such thing as a verbal or oral order of this board. It, therefore, follows that the appellee had no express contract with the county for the building of the bridge.[75]

The Mississippi court was confronted with comparable facts in 1952, when a piling of a county bridge sank, and the president of the board of supervisors of the county, purporting to act for the board, rented two barges to

---

[72] *Id.* at 913-14.

[73] *Id.* at 913-15.

[74] *Id.* at 914 (quoting *Groton Bridge & Mfg. Co. v. Bd. of Sup'rs of Warren Cty.*, 31 So. 711, 712 (Miss. 1902)).

[75] *Id.*

support the bridge pending repairs.[76] The court held that the owner of the barges could not recover the rental, reasoning that:

> It has been repeatedly held in this State that a board of supervisors can contract and render the county liable only by a valid order duly entered upon its minutes, that all persons dealing with a board of supervisors are chargeable with knowledge of this law, that a county is not liable on a quantum meruit basis even though it may have made partial payments on a void oral contract, and, moreover, that in such case there is no estoppel against the county.[77]

In a 1970, *Burt v. Calhoun*, Burt was the county engineer "on a number of state aid road projects" and was paid for work under contracts described in the minutes.[78] He sought payment for projects commenced after the last contract reflected in the board's minutes had expired, contending that actions of the board set forth in its minutes regarding submissions to the division of state aid road construction, the engineer's estimate for each project, and records of notices to bidders "ratified and confirmed the employment of Burt as [the] county engineer."[79] The Mississippi Supreme Court rejected this contention, holding that "[n]o contract can be implied or presumed, [it] must be stated in express terms and recorded on the official minutes as the action of the board of supervisors."[80]

Mississippi has enforced the minutes requirement strictly, even when "apparent injustice" results.[81] In *Colle Towing Co. v. Harrison County*, the

---

[76] *Colle Towing Co. v. Harrison County*, 57 So. 2d 171, 171-72 (Miss. 1952).

[77] *Id.* at 172.

[78] *Burt v. Calhoun*, 231 So. 2d 496, 497 (Miss. 1970).

[79] *Id.* at 499.

[80] *Id.*

[81] *Colle Towing Co.*, 57 So. 2d at 172-73; *see also Butler v. Bd. Of Supervisors for Hinds Cty.*, 659 So. 2d 578, 580, 582 (Miss. 1995) (affirming dismissal based on the minutes rule, even though the contract changes had been approved by the board architect, because the changes were not entered upon the board minutes).

parties conceded that an attempt by the board to ratify a prior oral contract was "void and that no valid contract was ever made."[82]  The court rejected the private party's argument for equitable relief, noting that "a board of supervisors can contract and render the county liable only by a valid order duly entered upon its minutes."[83]

In *Rawls Springs Utility District v. Novak*, the court refused to bind a board to an agreement made between the president of the district and a private individual that was not recorded on the minutes.[84]  Because the president had no authority to enter into the agreement, the court determined that the agreement was void,[85] and the county could pursue its claims against the private individual.[86]

Mississippi courts have enforced contract terms not fully described nor included in board minutes when the essential terms of the agreement could be ascertained from the minutes.  For example, in *Cheatham v. Smith*, the minutes of the county board of education authorized the superintendent to contract with "named person[s] . . . at the place and salaries as indicated below."[87]  An extensive list included in the minutes named the plaintiff and set a precise salary.[88]  The court determined that a valid contract existed for the salary recorded in the minutes, even though the individual's contract was not attached.[89]  The court refused, however, to enforce an educational prerequisite not reflected in the minutes.[90]

---

[82] 57 So. 2d at 172.

[83] *Id.*

[84] 765 So. 2d 1288, 1290, 1292 (Miss. 2000).

[85] *Id.* at 1292.

[86] *Id.* at 1292-93.

[87] 92 So. 2d 203, 204 (Miss. 1957).

[88] *Id.*

[89] *Id.* at 208.

[90] *Id.* at 207.

No. 16-60245

In *Community Extended Care Centers, Inc. v. Board of Supervisors for Humphreys County*, a Mississippi appellate court considered a nursing home lease not attached to the original board minutes, but recorded in the chancery clerk's office in the deed records.[91]  The minutes authorized the president to enter into a lease and reflected two lease amendments, and the board accepted monthly rent payments and collected taxes under the terms of the lease for thirteen years.[92]  Considering the acts described in the minutes, as well as the fact that the lease was recorded in the public land records, a divided panel determined that the lease was enforceable against the county.[93]

These decisions do not support a contention that application of the minutes rule is applied selectively to arbitration provisions or an argument that the minutes requirement is not generally applicable to contracts with public entities.  As to Horne's contention that boards may choose to omit mention of arbitration provisions in minutes to avoid enforcement of arbitration clauses, Mississippi courts have held for decades that "it is the responsibility of the entity contracting with the Board, not the responsibility of the Board itself, to ensure that 'the contract is legal and properly recorded on the minutes of the board.'"[94]  Horne's contention that the minutes requirement fails to place arbitration contracts on equal footing with other contracts is not borne out by Mississippi court decisions.

---

[91] 756 So. 2d 798, 799-800, 801 (Miss. Ct. App. 1999).

[92] *Id.* at 799-800.

[93] *Id.* at 802-04.  The dissent would have held the lease invalid because the minutes did not include the "principal rights and obligations of the parties," including the lease payment.  *Id.* at 805 (King, P.J., dissenting).

[94] *Wellness, Inc. v. Pearl River Cty. Hosp.*, 178 So. 3d 1287, 1291 (Miss. 2015) (quoting *Thompson v. Jones Cty. Cmty. Hosp.*, 352 So. 2d 795, 797 (Miss. 1977)).

No. 16-60245

## IV

Horne argues in the alternative that the court should equitably estop NRMC from denying the existence of the three engagement letters and the enforceability of the arbitration agreements reflected in them.  A court considering an argument that a party should be equitably estopped looks to state law theories of estoppel for guidance.[95]

Mississippi courts have consistently denied attempts to overcome the minutes rule based on equitable arguments.  In *Colle Towing Co.*, the president of a county board of supervisors, purporting to act for the board, entered into an oral agreement to rent barges.[96]  Though it was conceded that a ratification order from the board was void, the private party attempted to recover in equity based on the oral agreement, periodic payments made by the county, and the attempted ratification.[97]  The court held that the county was "not liable on a *quantum meruit* basis even though it may have made partial payments on a void oral contract, and, moreover, that in such case there is no estoppel against the county," reiterating that the board can act only through its minutes, and that "all persons dealing with a board of supervisors are chargeable with knowledge of [the minutes rule]."[98]

Though the minutes rule may work "apparent injustice," Mississippi's law is unsympathetic to arguments based in equity and instead requires private parties to ensure that their contracts are properly recorded in board

---

[95] *See Al Rushaid v. Nat'l Oilwell Varco, Inc.*, 814 F.3d 300, 305 (5th Cir. 2016).
[96] 57 So. 2d 171, 171-72 (Miss. 1952).
[97] *Id.*
[98] *Id.* at 172.

minutes.[99] The district court did not abuse its discretion in rejecting Horne's arguments sounding in equity.

*      *      *

For the foregoing reasons, the district court's denial of Horne's motion to compel arbitration is AFFIRMED as to the 2010 and 2012 engagement letters, and VACATED as to the 2009 engagement letter. We remand for further proceedings consistent with this opinion.

---

[99] *See Urban Developers LLC v. City of Jackson,* 468 F.3d 281, 300, 302 (5th Cir. 2006); *Rawls Springs Util. Dist. v. Novak,* 765 So. 2d 1288, 1292-93; *Colle Towing Co.,* 57 So. 2d at 172.